UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MICHAEL A. LENTZ, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:18-cv-03938-TAB-TWP |
| ) | |
| MARION COUNTY SHERIFF'S OFFICE, et al. ) | |
| ) | |
| Defendants. ) | |

**ORDER ON DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT AND TO EXCLUDE EXPERT WITNESS**

**I. Introduction**

Police arrested Plaintiff Michael A. Lentz in November 2017 on a charge of operating a vehicle while intoxicated. After initial processing and a medical evaluation, law enforcement placed him in a holding cell in the sub-basement of the City County Building in downtown Indianapolis. Like other pretrial detainees, Lentz was to be held in this cell until taken to court, released, or transported to the Marion County Jail. While sleeping in this cell, two other pretrial detainees brutally beat and strangled Lentz.

Lentz brings this action against the Marion County Sheriff's Office pursuant to 42 U.S.C. § 1983 asserting his assault violated the Fourteenth Amendment Due Process Clause and resulted from negligence under Indiana law.[1] Lentz claims that the MCSO maintains an unlawful policy, practice, or custom of holding non-violent, misdemeanor arrestees who are elderly and frail in

---

[1] Lentz also asserts claims against individual defendants employed by MCSO. [Filing No. 30]. In response to defendants' motion for summary judgment, Lentz abandons his claims against the individual defendants. [Filing No. 53, at ECF p. 19.] Accordingly, the individual defendants' motion for summary judgment, [Filing No. 45], is granted.

the same cell as arrestees who have previously been convicted of a violent felony. MCSO has moved for summary judgment. [Filing No. 45.] MCSO has also filed a motion to exclude the testimony of Lentz's expert witness. [Filing No. 59.] For the reasons explained below, the motion for summary judgment [Filing No. 45], is granted and the motion to exclude, [Filing No. 59], is denied as moot.

## II.  Factual Background[2]

### A.  *Undisputed Material Facts*

**General intake policy for pretrial detainees in Marion County**

The Marion County Jail houses pretrial detainees and prisoners serving criminal sentences. [Filing No. 45-4, at ECF p. 9-10.] Before detainees are taken to the jail and assigned long-term housing, they are brought to the sub-basement of the City-County Building. [Filing No. 45-4, at ECF p. 9-10.] MCSO has custody and control of detainees while they are in the sub-basement. [Filing No. 45-4, at ECF p. 9-10.] An MCSO custody officer screens detainees upon their arrival. [Filing No. 45-4, at ECF p. 13-16.] The custody officer determines the detainees' overall condition, including the extent of their injuries and level of intoxication. [Filing No. 45-4, at ECF p. 14.] The custody officer also inventories detainees' personal property, searches detainees for weapons and contraband, and reviews paperwork submitted by detainees' arresting officers. [Filing No. 45-4, at ECF p. 13-16.] Behind the scenes, other MCSO employees fill out paperwork, search for warrants, and review detainees' Marion County arrest records. [Filing No. 45-4, at ECF p. 16.]

---

[2] In deciding a motion for summary judgment, the Court views the record in the light most favorable to Lentz and draws all reasonable inferences in his favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018).

After this initial screening, compliant detainees are sent to the medical holding cell where they are evaluated by the nursing staff. [Filing No. 45-4, at ECF p. 16.] The medical holding cell is a "constant revolving door." [Filing No. 45-4, at ECF p. 16.] MCSO's policy objective is to keep all detainees moving quickly through this process to avoid bottlenecks. [Filing No. 45-4, at ECF p. 24.] Non-compliant detainees, many of whom are combative or highly intoxicated, are taken to individual holding cells until they become compliant and can be evaluated by the nursing staff. [Filing No. 45-4, at ECF p. 15.] The nursing staff ultimately decides whether detainees should be held in the sub-basement or sent to a local hospital for medical treatment. [Filing No. 45-4, at ECF p. 15.] The members of the nursing staff are not employees of MCSO. [Filing No. 45-4, at ECF p. 15]; [Filing No. 45-5, at ECF p. 2.] At the time of Lentz's arrest, the nursing staff was provided by Correct Care Solutions. [Filing No. 45-2, at ECF p. 2.] MCSO staff take booking photos and collect electronic fingerprints in the medical holding cell. [Filing No. 45-4, at ECF p. 17.]

After the medical evaluation and all other intake processing is complete, detainees are taken to a holding cell in another area of the sub-basement until a court determines whether they will remain in custody or be released. [Filing No. 45-4, at ECF p. 17.] Detainees are not formally classified based on security risk before they are placed in a holding cell. [Filing No. 45-4, at ECF p. 19.] However, juveniles are separated from adults, men are separated from women, and all detainees in the sub-basement are separated from detainees and prisoners in the jail. [Filing No. 60-2, at ECF p. 2.] Combative detainees, detainees confined to a wheelchair, a walker, or crutches, detainees who may be suicidal, and detainees charged with murder are held in individual cells. [Filing No. 45-4, at ECF p. 31]; [Filing No. 45-7, at ECF p. 6]; [Filing No. 45-11, at ECF p. 4-5].

There are approximately 10 individual cells in the sub-basement. [Filing No. 45-11, at ECF p. 4.] These cells generally are fully occupied by detainees who meet the foregoing criteria. [Filing No. 45-11, at ECF p. 4.] "High profile" detainees and those charged with a major felony (murder or a Level 1, 2, or 3 felony) are processed more quickly because there is a presumption that they will not be released. [Filing No. 45-4, at ECF p. 19, 21, 24]; [Filing No. 45-11, at ECF p. 4.] All other detainees are held in the same cell until they are taken to court, released, or transported to the jail. [Filing No. 45-11, at ECF p. 4]; [Filing No. 45-7, at ECF p. 7.] Prior criminal history is not a factor in detainees' temporary placement within the sub-basement. [Filing No. 45-7, at ECF p. 7.]

MCSO Colonel James Martin testified that the policy of not segregating detainees based on security risk in the sub-basement is driven by the need to keep arrestees moving quickly through the intake process. [Filing No. 45-4, at ECF p. 24.] Although space in the sub-basement is limited, Colonel Martin testified that there is space available to separate detainees charged with violent felonies from all other inmates. [Filing No. 45-4, at ECF p. 23.] Colonel Martin did not testify as to whether there is space available in the sub-basement to separate detainees with prior violent felony convictions from all other detainees. Detainees may be held in the sub-basement for up to 36 hours. [Filing No. 45-7, at ECF p. 5.]

**Lentz's detention and evaluation**

Lentz was arrested shortly before midnight on November 14, 2017, on suspicion of operating a vehicle while intoxicated, a Class A misdemeanor. [Filing No. 45-1, at ECF p. 9]; [Filing No. 45-3.] At the time of his arrest, Lentz was 71 years old. [Filing No. 45-3.] When Lentz arrived at the sub-basement of the City-County Building, a custody officer asked him "basic questions about where [he] lived and all that." [Filing No. 45-1, at ECF p. 10-11.] The

4

room near the entrance of the sub-basement was filled with "wall-to-wall people" who had also recently been arrested. [Filing No. 45-1, at ECF p. 11.] Lentz felt concerned for his safety based on his previous experiences at the jail, the general demeanor of his fellow detainees, and a fight he witnessed shortly after he arrived at the sub-basement. [Filing No. 45-1, at ECF p. 14, 15, 18.] Lentz did not inform anyone in the sub-basement that he was concerned for his safety. [Filing No. 45-1, at ECF p. at 18.]

Lentz was medically evaluated by Tamara Pfeiffer, a nursing assistant employed by Correct Care Solutions. [Filing No. 45-5, at ECF p. 1]; [Filing No. 45-6.] Lentz appeared alert and logical at the time of his medical evaluation. [Filing No. 45-4, at ECF p. 2]; [Filing No. 45-6.] Lentz told Pfeiffer that he had consumed six to seven beers on the day of his arrest. He did not show signs of intoxication or withdrawal. *Id.* Lentz told Pfeiffer that he did not have any medical conditions and had never been hospitalized by a physician or a psychiatrist. *Id.* Lentz told Pfeiffer that he was not taking any psychotropic medications, that he did not have a history of taking psychotropic medications, and that he did not have a history of outpatient mental health treatment. *Id.*

At the time of his arrest, Lentz was being treated for bipolar disorder. [Filing No. 44-2, at ECF pp. 24, 39]. He was taking Lithium as prescribed and was asymptomatic. *Id.* He did not disclose this information to Pfeiffer during the medical evaluation. [Filing No. 45-5, at ECF p. 2]; [Filing No. 45-6.] Lentz was treated for colon cancer approximately seven to eight years ago and is in remission. [Filing No. 45-1, at ECF p. 34.] He also did not disclose this information to Pfeiffer during the medical evaluation. [Filing No. 45-5, at ECF p. 2]; [Filing No. 45-6.]

At the time of his arrest, Lentz did not have trouble walking and did not require the use of a cane, a walker, or other mobility device. [Filing No. 45-1, at ECF p. 36]. Lentz has never been

5

diagnosed with diabetes. [Filing No. 45-1, at ECF p. 33.] Lentz testified that he was not "frail" at the time of his arrest. [Filing No. 45-1, at ECF p. 36.] Pfeiffer did not believe that Lentz displayed signs of being at risk for victimization. [Filing No. 45-1, at ECF p. 36.] Pfeiffer did not refer Lentz for a psychological evaluation. [Filing No. 45-1, at ECF p. 36.] Pfeiffer saw no need to segregate Lentz from other detainees and determined that he could be placed in the general population. [Filing No. 45-5, at ECF p. 3]; [Filing No. 45-6.]

**Lentz's placement in cell LMG after his medical evaluation**

Following his medical evaluation, Lentz was placed in cell LMG in the sub-basement at 10:02 a.m. [Filing No. 45-20, at ECF p. 2.] Lentz remained in cell LMG until he was attacked later that evening. [Filing No. 45-20, at ECF p. 2.] Cell LMG is a room with concrete walls. The only visibility into the cell is through a small rectangular grate on the cell's locked metal door. [Filing No. 45-4, at ECF p. 32.] The interior of cell LMG is recorded at all times by a security camera, but no MCSO employee is assigned to monitor the video footage. [Filing No. 45-4, at ECF p. 27-28.] Although an MCSO employee is typically in the room where the footage from this camera is displayed, that employee is engaged in other assigned tasks and is unable or unwilling to monitor the footage. [Filing No. 45-4, at ECF p. 27-28.]

The Indiana Administrative Code provides the following requirement on county jails: "A jail officer shall conduct a clock round, not including observation by a monitoring device, of each inmate at least once every 60 minutes. The observation may be conducted on an irregular schedule and shall be documented." 210 IAC 3-1-14. MCSO policy requires a deputy to perform an in-person visual inspection, or "clock round" of cell LMG every 30 minutes. [Filing No. 60-3.] Sgt. Anthony Carter testified that he and other deputies strive to perform clock rounds every 15 minutes. [Filing No. 45-7, at ECF p. 9.]

Before the assault on Lentz, clock rounds were performed at 2:43 p.m. and 4:01 p.m. [Filing No. 45-4, at ECF p. 35]; [Filing No. 45-8, at ECF p. 3.] Video recordings show that deputies entered cell LMG to transport an inmate at the following times in the hour before Lentz was attacked: 4:06 p.m., 4:07 p.m., 4:09 p.m., 4:18 p.m., 4:21 p.m., 4:38 p.m., and 4:48 p.m. [Filing No. 45-9.] There is no intercom system in cell LMG. [Filing No. 45-4, at ECF p. 32.] Prisoners can only get the attention of those outside the cell by shouting when a member of MCSO staff is nearby. [Filing No. 45-4, at ECF p. 32.]

**Ousman Maclean and Johnny Galarza attack Lentz in cell LMG**

At 4:54 p.m., Lentz was sleeping in cell LMG and was attacked by Ousman Maclean and Johnny Galarza. [Filing No. 45-1, at ECF pp. 15-17]; [Filing No. 45-10, at ECF p. 1.] Maclean and Galarza brutally beat and strangled Lentz for approximately ten minutes. By the end, their clothing was covered in his blood, and Lentz was left unconscious. [Filing No. 45-1, at ECF pp. 15-17]; [Filing No. 45-10.]

At 5:05 p.m., Corporal Rogers and Sgt. Carter approached cell LMG to perform an hourly clock round. [Filing No. 45-7, at ECF p. 7.] As they approached, the detainees in cell LMG yelled "Seizure!" and alerted that a detainee in the cell was dying. [Filing No. 45-7, at ECF p. 7.] Corporal Rogers and Sergeant Carter entered cell LMG in response to the detainees' cries for help. [Filing No. 45-7, at ECF p. 24, 34.] By the time they entered the room, the attack was over. [Filing No. 45-7, at ECF p. 24, 34.] Lentz was unconscious on a bench, and the other detainees were standing around the cell. [Filing No. 45-7, at ECF p. 24, 34.] Lentz was transported to a local hospital to receive treatment for his injuries. [Filing No. 45-7, at ECF p. 34]; [Filing No. 45-1, at ECF pp. 16-17.]

**Criminal histories and classifications**

In 2011, Lentz was charged with criminal recklessness, a Class D felony, in Marion County Superior Court. [Filing No. 45-3.] He was ultimately convicted of pointing a firearm as a Class A misdemeanor. [Filing No. 45-3.]

On November 15, 2017, Maclean was arrested on the following charges: resisting law enforcement, a Class A misdemeanor; battery, a Class B misdemeanor; disorderly conduct, a Class B misdemeanor; and public intoxication, a Class B misdemeanor.[3] *See also* Indiana Criminal Case No. 49G07-CM-1711-044235. At the time of his arrest on November 15, 2017, Maclean had the following prior felony convictions[4]: residential entry, a Class D felony; battery by bodily waste, a Class D felony; battery on a public safety officer, a Level 6 felony; and criminal trespass, a Level 6 felony.

On November 15, 2017, Galarza was arrested on the following charges: auto theft, a Level 6 felony; possession of a narcotic drug, a Level 6 felony; and unlawful possession of a syringe, a Level 6 felony.[5] At the time of his arrest on November 15, 2017, Galarza had the following prior felony convictions[6]: criminal recklessness, a Class D felony; and resisting law enforcement, a Class D felony.

Although it is not the policy of MCSO to formally classify detainees in the sub-basement, both Galarza and Maclean were formally classified in the sub-basement as Level 6 security, the minimum-security level for a presentenced inmate. [Filing No. 60-2, at ECF p. 3.] After the

---

[3] The Court takes judicial notice of Indiana Criminal Case No. 49G07-CM-1711-044235.
[4] The Court takes judicial notice of Indiana Case Nos. 49G06-1006-FD-040611, 49G24-1310-FD-067219, 49G18-1508-CM-027179, and 49G18-1612-F6-048505.
[5] The Court takes judicial notice of Indiana Criminal Case No. 49G06-1711-F6-044814.
[6] The Court takes judicial notice of Indiana Criminal Case No. 49G15-1412-F6-056484.

attack on Lentz, Ousman and Galarza were reclassified to higher security levels. [Filing No. 60-2, at ECF p. 3.]

## B. Facts in Dispute

The parties dispute whether MCSO has a policy, practice, or custom of placing detainees charged with Level 1, Level 2, or Level 3 felonies in holding cells with detainees charged with non-violent misdemeanors.[7] [Filing No. 45, at ECF p. 7]; [Filing No. 53, at ECF p. 7.] MCSO's expert witness, Tim Ryan, opines that MCSO has "policies, procedures, and practices that meet or exceed the legal requirements of the State of Indiana Administrative Code under the 'County Jail Standards,' and that its practices mirror the 'best practices' as identified by the American Correctional Association's *Performance-Based Standards for Adult local Detention Facilities*." [Filing No. 45-21, at ECF p. 5.]

In support of this opinion, Ryan states the following:

  a. "[Recently arrested detainees] believe that since their release is imminent, they will do nothing to jeopardize their expected quick return to the community." [Filing No. 45-21, at ECF p. 6.]

  b. MCSO's failure to classify detainees in the holding cells of the sub-basement based on their security risks is not required under objective correctional standards. [Filing No. 45-21, at ECF p. 6.]

  c. Indiana's administrative monitoring standard, requiring a documented clock round on the inmate at least once every 60 minutes, "was met through computer

---

[7] Because Lentz was not attacked by an inmate charged with a Level 1, Level 2, or Level 3 felony, this is not a material factual dispute.

      and video logging with formal observations and unscheduled deputy visits to the LMG." [Filing No. 45-21, at ECF p. 6.]

   d. "[H]ad there been any danger or warning signs exhibited relative to Mr. Lentz, the staff would have been readily available, and Mr. Lentz could have called for help." [Filing No. 45-21, at ECF p. 6.]

Lentz's expert witness, Jeff Eiser, opines that MCSO's intake policies fail to satisfy correctional standards and best practices. [Filing No. 54-11.] In support of this opinion, Eiser states the following:

   a. "It is well-known in the jail industry that special care must be taken with the housing and supervision of newly admitted inmates. The risk and needs of each newly admitted inmate should be assessed and addressed individually, based on objective and identifiable criteria, which provides for placement of the inmate in the least restrictive housing, compatible with his or her assessed risk and needs." [Filing No. 54-11, at ECF p. 9.]

   b. "Newly arrested prisoners that are elderly and frail are a very common occurrence in today's jails and are usually considered 'vulnerable' prisoners and in need of special attention." [Filing No. 54-11, at ECF p. 9.]

   c. "Based upon my 30 years of practical experience, the architecture of Holding Cell LMG created a greater need for routine officer presence and supervision. This is a common challenge in courthouses and court buildings throughout the country. In a building which includes a 'court holding' cell area, it is vitally important that newly arrived detainees (before formal classification and risk assessment process takes place) are in actual view of an officer or officer(s). Placing newly arrived

      unclassified inmates together in a holding cell with little or no monitoring is asking for a serious problem . . . like what happened to Mr. Lentz on November 15, 2017." [Filing No. 54-11, at ECF p. 14.]

d. "Unscheduled deputy visits," during which a deputy enters a cell to remove an inmate, do not provide adequate substitutes for formal clock rounds because the deputy's attention is primarily focused on safely removing the inmate rather than observing the other detainees in the cell. [Filing No. 60-1, at ECF pp. 38-43.]

### III. Analysis

#### A. *Fourteenth Amendment Due Process*

The amended complaint claims that MCSO's "policy of housing frail, elderly inmates with violent felons is unconstitutional and violated Lentz' rights under the Fourteenth Amendment to be free from deliberate indifference to his health and safety." [Filing No. 30, at ECF p. 5.] The amended complaint alleges that this policy caused Lentz to be attacked by Maclean and Galarza, two violent felons who were placed in the same temporary holding cell. *Id.* The amended complaint further alleges that the cell where the attack occurred "was constructed so that the guards responsible for the safety of its occupants could not directly see or hear the inmates and could observe them only remotely by video." [Filing No. 30, at ECF p. 4.]

      Jail and prison officials have a constitutional duty to protect inmates from violence at the hands of other inmates. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *Mayoral v. Sheahan*, 245 F.3d 934, 938 (7th Cir. 2001). Because Lentz was a pretrial detainee at the time of this attack, his claims are analyzed under the Fourteenth Amendment Due Process Clause. *See Kingsley v. Hendrickson*, 135 S Ct. 2466, 2473 (2015).

For many years, the Seventh Circuit "analyzed pre-conviction Fourteenth Amendment and post-conviction Eighth Amendment conditions-of-confinement claims under the same standard: that of the Eighth Amendment, which has both a subjective and an objective component." *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019). The Eighth Amendment's subjective component analyzes whether the defendant's state of mind of was "deliberately indifferent 'to adverse conditions that deny the minimal civilized measure of life's necessities.' " *Id.* (quoting *Budd v. Motely*, 711 F.3d 840, 842 (7th Cir. 2013) (internal quotation marks omitted)).

In *Kingsley v. Hendrickson*, the Supreme Court put an end to this practice and held:

> [T]he appropriate standard for a pretrial detainee's excessive force claim is solely an objective one . . . [A] pretrial detainee can prevail by showing that the [defendant's] actions are not "rationally related to a legitimate non-punitive governmental purpose" or that the actions "appear excessive in relation to that purpose."

135 S. Ct. 2466, 2473 (2015). The Court noted that it had previously applied this objective standard "to evaluate a variety of prison conditions, including a prison's practice of double-bunking." *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 541-43 (1979)).

Although *Kingsley* dealt with a pretrial detainee's claim for excessive force, the Seventh Circuit recently held that this objective inquiry also applies to pretrial detainees' medical claims. *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). Following *Miranda*, the Seventh Circuit held that "*Kingsley*'s objective inquiry applies to all Fourteenth Amendment conditions-of-confinement claims brought by pretrial detainees." *Hardeman*, 933 F.3d at 823.

The parties analyze Lentz's claim under the Eighth Amendment's two-prong deliberate indifference standard. *See generally* [Filing Nos. 46, 53, 60]. Given the holdings in *Kingsley*,

12

*Miranda*, and *Hardeman*, Lentz's failure to protect claim must be analyzed under *Kingsley*'s objective standard.

Viewed in the light most favorable to Lentz, the evidence shows that MCSO has a policy, practice, or custom of holding newly arrested detainees charged with non-violent misdemeanors in the same large holding cells as newly arrested detainees charged with serious violent felonies (with the exception of murder); holding newly arrested detainees charged with non-violent misdemeanors in the same large cells as newly arrested detainees with prior violent felony convictions; and only segregating for infirmity those detainees who require a wheelchair, a walker, crutches, or other mobility device.

These polices, practices, or customs, however, are largely irrelevant to Lentz's claim. There is no evidence that Maclean or Galarza were being held on violent felony charges on November 15, 2017. To the contrary, Maclean was being held on four misdemeanor charges, and Galarza was held on three non-violent felony charges. Although Maclean has prior convictions for low-level, violent felonies, Galarza does not appear to have any prior convictions for crimes of violence. The evidence does not support a reasonable inference that Lentz was "frail" at the time of his arrest, and Lentz concedes that he concealed potentially relevant information about his health from the nursing staff during his medical evaluation.

Given this evidence, Lentz's due process claim against MCSO may only survive summary judgment if the evidence creates a reasonable inference that MCSO's policy of temporarily holding newly arrested detainees charged with non-violent misdemeanors in the same cells as other detainees with prior violent felony convictions is unconstitutional. To meet this burden, the evidence must show that the policy is not rationally related to a legitimate, non-punitive purpose or that the policy is excessive in relation to that purpose.

Colonel Martin testified that MCSO's policy for newly arrested detainees is driven by two purposes: avoiding bottlenecks during the initial intake process, and holding a high volume of newly arrested detainees in a limited amount of space. The initial intake area of the sub-basement was packed with newly arrested detainees on November 15, 2017. Before the detainees could be transported to a holding cell, they had to go through a variety of processes, including property inventory, searches for contraband, medical evaluations, fingerprinting, and booking photographs. Delaying the formal classification process until after the detainees are transported to the jail for long-term housing is rationally related to the legitimate penological purpose of avoiding bottlenecks in the initial intake process. Lentz has not produced evidence, such as the length of time required to conduct a formal classification that considers past criminal history, that suggests this policy is excessive in relation to its legitimate, non-punitive purpose.

There is limited space available to hold newly arrested detainees in the sub-basement. Although Colonel Martin testified that there would be enough space to separate detainees charged with serious violent felonies from the rest of the population, there is no evidence that there is space available to segregate every inmate who has previously been convicted of a violent felony conviction from those detainees charged with misdemeanors. The evidence does not suggest that this policy is excessive in relation to its legitimate, non-punitive purpose.

It is well-established that jail administrators are afforded "wide-ranging deference . . . in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979); *see also Smith v. Sangamon County Sheriff's Dept.*, 715 F.3d 188, 192 (holding that sheriff's department had discretion to consider classification factors beyond inmates' pending charges and criminal histories); *Mayoral*, F.3d at 939 (holding that jail's policy of not

segregating inmates based on gang affiliation was not unconstitutional because "[t]he number of gang members housed by the [facility] and the high representation of certain gangs would place an unmanageable burden on prison administrators.").

MCSO has the difficult task of processing and securing a high volume of newly arrested detainees in a safe and efficient manner. It prioritizes its limited resources to providing segregated holding cells to detainees charged with murder, detainees confined to wheelchairs and other mobility devices, and detainees at risk of suicide. Deputies frequently perform in-person clock rounds of detainees who are held together, and a security camera records video footage that can be reviewed during subsequent investigations and prosecutions. Under these circumstances, MCSO's policies were not objectively unreasonable.

Lentz was the victim of a random and brutal act of violence by two fellow detainees. However, there is no material evidence that this attack was caused by an unconstitutional policy, practice, or custom of MCSO. Accordingly, the defendants' motion for summary judgment on Lentz's Fourteenth Amendment due process claim is granted.

### B. *Negligence*

Lentz claims that MCSO "is negligent in the manner in which it maintains and operates the Marion County Lock-Up, which lacks a preliminary classification system and houses arrestees in locations where they cannot be readily observed by or communicate with correctional staff." [Filing No. 42, at ECF p. 2.]

Under Indiana law, the tort of negligence is comprised of three elements: (1) a duty on the defendant's part in relation to the plaintiff; (2) a breach of that duty, that is, a failure by the defendant to conform his or her conduct to the requisite standard of care required by the relationship; and (3) an injury to the plaintiff proximately resulting from such failure. *Estate of*

15

*Mintz v. Connecticut General Life Ins. Co.*, 905 N.E.2d 994, 998-99 (Ind. 2009). Indiana sheriffs have statutory a duty to "take care of the county jail and the prisoners there." Ind. Code § 36-2-13-5(a)(7).

MCSO argues that it is entitled to law enforcement immunity under the Indiana Tort Claims Act, which provides, "[a] governmental entity ... is not liable if a loss results from ... [t]he adoption and enforcement of or failure to adopt or enforce ... a law (including rules and regulations)...." Ind. Code § 34-13-3-3(8). To establish law enforcement immunity, the action being challenged must "be one in which government either compels obedience to laws, rules, or regulations or sanctions or attempts to sanction violations thereof." *Davis v. Animal Control—City of Evansville*, 948 N.E.2d 1161, 1164 (Ind. 2011) (quotation marks and citation omitted).

Law enforcement immunity encompasses actions related to the enforcement of a statute as well as rules and regulations, thereby immunizing "a variety of administrative and executive functions ..." *King v. Northeast Sec., Inc.*, 790 N.E.2d 474, 482 (Ind. 2003). Law enforcement immunity "attaches when the governmental activity involves the adoption and enforcement of laws, rules, or regulations (or the failure to do so) 'that falls within the scope of the entity's purpose or operational power' and are, thus, 'within the assignment of the governmental unit.'" *Cento v. Marion Cty. Sheriff's Office*, No. 1:17-cv-00431-TWP-DLP, 2018 WL 3872221 (S.D. Ind. Aug. 15, 2018) (quoting *King*, 790 N.E.2d at 482, 483).

This Court recently held that law enforcement immunity applied in a case involving a pretrial detainee's wrongful death claim against MCSO based on its "fail[ure] to monitor or implement existing procedures and protocols" regarding the proper evaluation of inmates for suicidal tendencies and to prevent potentially suicidal inmates from committing suicide. *Id.* The Court reasoned that the "rules and regulations of the MCSO ... for the protection of inmates

against suicide, and the enforcement thereof, fall squarely within the scope of the MCSO's ... operational power and purpose" and that the plaintiff's wrongful death claim based on the failure to develop and/or monitor or implement such procedures and protocols was therefore barred by the ITCA's law enforcement immunity. *Id.*; *accord Jones v. Forestal*, No. 1:18-cv-01987-SEB-DLP, 2020 WL 1469832 (S.D. Ind. March 26, 2020).

MCSO enforces and adopts rules and regulations to ensure that pretrial detainees are protected from attacks by other inmates. *E.g.* 210 IAC 3-1-14 ("A jail officer shall conduct a clock round, not including observation by a monitoring device, of each inmate at least once every sixty (60) minutes."). Lentz argues that MCSO was negligent because it failed to adequately enforce these rules and regulations and that MCSO should have adopted more stringent rules and regulations designed to protect detainees. MCSO has law enforcement immunity from this type of claim under the ITCA.

Even if MCSO did not have immunity against Lentz's negligence claims, it would still be entitled to summary judgment. MCSO's frequent monitoring of detainees in cell LMG, as well as its classification policies for newly arrested detainees, was not objectively unreasonable. Accordingly, defendants' motion for summary judgment on Lentz's negligence claim is granted.

Finally, MCSO filed a motion to exclude the testimony of Lentz's expert, Jeff Eiser. [Filing No. 59.] Because the Court has determined that summary judgment should be granted in favor of MCSO, this motion is denied as moot.

## V.  Conclusion

Lentz's summary judgment response abandoned his claims against the individual defendants, resulting in summary judgment in their favor.  Summary judgment is also appropriate on Lentz's due process claim against MCSO because of the lack of evidence that he was randomly attacked because of an unconstitutional policy, custom, or practice of MCSO.  Finally, summary judgment also is appropriate on Lentz's remaining negligence claim based upon law enforcement immunity and because MCSO's conduct was not objectively unreasonable.  Accordingly, defendants' motion for summary judgment [Filing No. 45] is granted. As a result, defendants' motion to exclude expert witness testimony [Filing No. 59] is denied as moot.

Date: 5/1/2020

_____

Tim A. Baker
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email